UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SOUTHRIDGE PARTNERS II LIMITED PARTNERSHIP, | : | CASE NO. 3:17-cv-01925 |
| PLAINTIFF, | : | |
| | : | |
| vs. | : | |
| | : | |
| POTNETWORK HOLDINGS, INC.; | : | |
| SND AUTO GROUP INC.; POTNETWORK | : | |
| HOLDING INC. N/K/A PNH HOLDING INC.; | : | |
| SIGN N DRIVE AUTO MALL INC.; | : | |
| CHARLES VACARRO; SECURITIES COUNSELORS, | : | |
| INC.; RANDALL GOULDING; RICHARD GOULDING | : | |
| AND GARY L. BLUM, | : | |
| | : | |
| DEFENDANTS | : | APRIL 6, 2018 |
| | : | |

## SECOND AMENDED COMPLAINT

Plaintiff, Southridge Partners II Limited Partnership (the "Plaintiff"), by its undersigned

attorneys, as and for its amended complaint against defendants PotNetwork Holdings, Inc., SND

Auto Group, Inc., PotNetwork Holding Inc. n/k/a PNH Holding Inc., Sign N Drive Auto Mall

Inc., Charles Vacarro, Gary L. Blum; Randall S. Goulding; Richard Goulding and Securities

Counselors Inc. (collectively the "Defendants"), pleads as follows:

### I. The Parties

1.      Plaintiff Southridge Partners II Limited Partnership ("Southridge") is a Delaware

limited partnership with a principal place of business located in Ridgefield, Connecticut.

2.      Defendant PotNetwork Holdings, Inc. is a Colorado bearing Colorado Secretary of

State ID number 20171182699 that, upon information and belief, maintains its principal office at

3278 Wilshire Boulevard, Suite 603, Los Angeles, California 90010.

3.      Defendant SND Auto Group Inc. is a Colorado corporation bearing Colorado Secretary of State ID number 201711202933d that, upon information and belief, has a principal office mailing address of 201 Santa Monica Boulevard, Suite 300, Santa Monica, California 90401.

4.      Defendant PotNetwork Holding Inc. is a Colorado corporation bearing Colorado Secretary of State ID number 20171202909 and currently named and known as "PNH Holding Inc." and, upon information and belief, maintains its principal office at 3278 Wilshire Boulevard, Suite 603, Los Angeles, California 90010.

5.      Defendant Sign N Drive Auto Mall Inc. is a New York corporation, with, upon information and belief, a mailing address of P.O. Box 663, Port Washington, New York 11050.

6.      Defendant Charles Vacarro is an individual and, upon information and belief, a resident of the state of New York.

7.      Defendant Securities Counselors, Inc. is an Illinois Corporation and, upon information and belief, maintains a principal address of 1333 Sprucewood Lane, Deerfield, Illinois 60015-4771.

8.      Defendant Randall S. Goulding is an individual and, upon information and belief, a resident of the State of Illinois and an attorney admitted to practice in the State of Illinois.

9.      Defendant Richard Goulding is an individual and, upon information and belief, a resident of the State of Illinois.

10.     Defendant Gary L. Blum is an individual and, upon information and belief, a resident of state of California.

## II. Jurisdiction and Venue

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) in that this action is between citizens of different states and the matter in controversy exceeds $75,000.00 exclusive of interest, costs and attorneys' fees.

12.     The Court has personal Jurisdiction over defendants PotNetwork Holdings, Inc., SND Auto Group Inc., PotNetwork Holding Inc., Sign N Drive Auto Mall Inc. and Securities Counselors, Inc. pursuant to C.G.S. § 33-929(e), (f)(1), (f)(2) and(f)(4) .

13.     The Court has personal jurisdiction over defendants Charles Vacarro, Gary Blum, Randall S. Goulding, and Richard Goulding pursuant to C.G.S. § 52-59b(3).

14.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) or (2), and pursuant to a mandatory forum selection clause contained in a contract binding upon Plaintiff and defendants PotNetwork Holdings, Inc., SND Auto Group Inc., PotNetwork Holding Inc. and Sign N Drive Auto Mall Inc.

## III.   Facts Common to All Causes of Action

15.     Defendant PotNetwork Holdings, Inc. ("Original Company"), not to be confused defendant PotNetwork Holding Inc. (defined below is "New PHI") was originally organized on November 26, 2004 under the laws of the state of Wyoming.

16.     Original Company's common stock was quoted to trade over-the-counter in the United States and elsewhere under the symbol "POTN" and its primary trading venue was over the Link ATS operated by OTC Markets Group, Inc.

17.     Following its formation in 2004, Original Company filed papers with the Wyoming Secretary of State to amend its articles to change its name six times, as follows:

(a) on June 26, 2008, to change name to "United Treatment Centers, Inc."

(b) on February 4, 2013, to change name to "Element Trading Holding, Inc."

(c) on March 5, 2014, to change name to "United Treatment Centers, Inc."

(d) on July 21, 2015, to change name to "Potnetwork Holdings, Inc."

(e) on May 20, 2016, to change name to "SND Auto Group, Inc." and

(f) on March 1, 2017, to change name to "Potnetwork Holding Inc."

***The Convertible Promissory Note***

18.     On June 2, 2014, Sunrise Auto Mall Inc. ("SAMI"), a wholly owned subsidiary of Original Company, as maker, entered into a Convertible Promissory Note (the "Note 1") with David Grey, as holder, in the principal amount of One Million Eight Hundred and Fifty Thousand Dollars ($1,850,000.00) with a maturity date of June 2, 2015.

19.     Pursuant to the terms of Note 1, the holder was granted the right to convert all or any part of the outstanding and unpaid principal amounts of Note 1 into fully paid and non-assessable shares of maker's common stock at a price determined in accordance with the conversion provisions set forth in the note; the maker's conversion right continued until the later of  the maturity date of the Note 1 or the date of payment of the remaining outstanding principal balance amount plus any accrued and unpaid interest.

20.     Note 1 contained certain "anti-dilution" provisions which, *inter alia*, require,  in case of any merger to which Original Company is a party and in which Original Company is not the surviving or continuing corporation, that, as a condition to such merger, provision shall be made so that, in the event of a conversion, the holder under Note 1 shall receive, in lieu of the securities and property receivable upon the conversion of this Note prior to consummation of the transaction, the kind and amount of shares or other securities and property receivable upon such consolidation or merger by a holder of the number of shares of Common Stock into which Note 1

would have been converted immediately prior to such consolidation or merger had the conversion occurred, and which provisions further require that the terms of Note 1 shall be applicable to the securities or property receivable upon the conversion of Note 1 after consummation of such merger.

21.    Note 1 also contained express provisions prohibiting Original Company from taking any action that would impair the rights and privileges of the holder or avoiding or seeking to avoid the observance or performance of any of the terms to be observed or performed  by Original Company; and requiring Original Company at all times to act in good faith to assist in carrying out the provision of the note, including the conversion rights provided in the note, and further requiring Original Company to take all such action as may be necessary or appropriate in order to protect the conversion rights of the holder of the note.

22.    Note 1 also contained Original Company's express agreement that irreparable damage would occur in the event that nay of the provisions of the note were not performed in accordance with their specific terms or were otherwise breached, and that the holder of the note would be entitled to swift specific performance, injunctive relief or other equitable remedies to prevent or cure beaches of the note or to enforce specifically the terms and provisions thereof.

23.    Upon information and belief, Original Company was a beneficiary of Note 1.

24.    As of July 1, 2015, the entire principal balance of Note 1, plus all accrued interest, remained unpaid and outstanding.

25.    On July 1, 2015, Grey, as seller, and Sign N Drive Auto Mall Inc. ("SND") (a defendant herein), as buyer, together with SAMI, entered into a written Assignment of Note Agreement pursuant to which Grey agreed to sell, assign and  transfer all of his right, title and interest in and to Note 1 to SND.

26.     Upon information and believe, defendant Charles Vacarro ("Vacarro"), at all relevant times, was a control person with respect to both SND, SAMI and Original Company in that he possessed the power to direct the management and policies of all of those companies.

27.     On July 1, 2015, Grey, pursuant to the July 1, 2015 Assignment of Note Agreement, assigned and transferred all of his right, title and interest in and to the Note 1 to SND.

28.     SND paid sufficient consideration to Grey in exchange for Grey's assignment and transfer of his rights in and to the Note 1 to SND, including, but not limited to, SND's execution on July 1, 2015 of a promissory note payable to Grey in the amount of $250,000.

29.     By unanimous written consent of the Board of Directors (the "Board") of the Original Company dated July 1, 2015, the Board resolved to, *inter alia*, assume the obligations of SAMI under Note 1 and to exchange Note 1, for no additional consideration, for a convertible promissory note to be issued by the Original Company to SND in the amount of One Million Eight Hundred and Fifty Thousand Dollars ($1,850,000.00) and containing the same terms as Note 1.

30.     In accordance with the Board's July 1, 2015 unanimous written consent, on July 1, 2015 Original Company, as maker entered into a Convertible Promissory Note ("Note 2") with SND, as holder,  in the original principal amount of One Million Eight Hundred Fifty Thousand Dollars ($1,850,000.00); the date of Note 2 expressly tacked back to June 2, 2014. A true and accurate copy of Note 2 annexed hereto as Exhibit "A."

31.     Note 2 contained the same terms and conditions as Note 1, including, but not limited to, the anti-dilution provisions, Original Company's express covenant to act in good faith, and Original's Company's agreement that the holder would suffer irreparable injury and be entitled to specific performance; however, Note 2 granted the holder the right to convert outstanding

principal and interest due under the note to common stock of the Original Company instead of SAMI.

***Sale of Portion of Note 2 to Plaintiff Southridge and Exercise of Conversion Rights***

32.    As of July 18, 2016, the entire principal balance of Note 2, together with all accrued interest, remained unpaid and outstanding.

33.    On July 18, 2016, SND, as seller, entered into a written Securities Transfer Agreement (the "STA") with plaintiff Southridge,  as buyer, pursuant to which SND sold and delivered to Southridge, for sufficient consideration paid to SND by Southridge, $25,000 in principal plus all interest accrued on such principal, of the remaining and outstanding balance owed to SND under Note 2; included in the sale to Southridge were all of SND's conversion rights under Note 2 associated with the portion of the outstanding balance of Note 2 sold to Southridge.  A true and accurate copy of the STA is annexed hereto as Exhibit "B."

34.    Original Company was a signatory to the STA, and made express warranties and representations in the STA upon which Southridge relied and which were material to Southridge's agreement to enter into the STA, including, but not limited to, that:

(a)  Original Company would execute a replacement promissory note with Southridge named as holder;

(b)  Original Company would treat Southridge as a party to Note 2 with all the rights of, in place and stead of SND; and

(c)  Original Company had instructed its transfer agent to reserve at least 3,000,000 shares of Original Company's Common Stock for issuance to Southridge upon Southridge's exercise of its conversion rights;

(d)  No payments had been made to SND on account of Note 2 and SND had not, directly or indirectly, waived or relinquished any of its rights under Note 2 and the provisions of Note 2 remain in full force and effect.

35.    The seller, SND, also made express warranties under the STA including, but not limited to, the representation that SND was not, both as of the date of the STA and for a period of at least ninety days prior to the date of the STA, an "Affiliate" of Original Company as that term is defined in 17 C.F.R. § 230.144 ("Rule 144").

36.    By its execution of the STA, Original Company confirmed that SND was not and had not been an Affiliate of Original Company for the purpose of Rule 144.

37.    Southridge paid SND the consideration specified in the STA and fully complied with all its obligations arising under STA.

38.    Notwithstanding the terms the STA, Original Company never issued a replacement note to Southridge to reflect the portion of Note 2 purchased by Southridge.

39.    Pursuant to a written Notice of Conversion issued by Southridge to Original Company dated July 25, 2016 (the "First Conversion Notice"), Southridge duly and properly exercised its conversion right under Note 2 and converted principal in the amount of $3,300.00 into 3,882,353 shares of common stock of the Original Company. A true an accurate copy of the First Conversion Notice is attached hereto as Exhibit "C."

40.    Original Company complied with the First Conversion Notice and issued 3,882,353 shares of Original Company Common Stock to Southridge, which shares Southridge held until it sold them in July 2017.

41.    Upon completion of the First Conversion Notice, the balance of the STA held by Southridge was $22,500.

42.     Pursuant to a second written Notice of Conversion (the "Second Conversion Notice") issued by Southridge to the Original Company dated January 30, 2017, Southridge duly and properly exercised its conversion right under Note 2 and converted principal in the amount of $4,161.64 into an  additional 2,972,600 shares ("Conversion Shares") of common stock of the Original Company. A true and accurate copy of the Second Conversion Notice is annexed hereto as Exhibit "D."

43.     Original Company ignored the Second Conversion Notice and failed and refused to issue Southridge any shares of Original Company's common stock to Southridge pursuant to that conversion notice.

***The Merger Transaction***

44.     On March 3, 2017, Original Company filed a Statement of Conversion with Colorado Secretary of State, together with Articles of Incorporation, pursuant to which Original Company converted from a Wyoming corporation to a Colorado corporation.

45.      On March 13, 2017, Original Company filed a Restated Constituent with the Colorado Secretary of State wherein Original Company disclosed its intention to reorganize in a manner functionally equivalent to reorganization pursuant to Section 251(g) of the General Corporation Law of Delaware.

46.     On March 14, 2017, Original Company filed an Amended and Restated Articles of Incorporation with the Colorado Secretary of State pursuant to which, *inter alia*, Original Company changed its name from "Potnetwork Holding Inc." to "PHI Transition Corporation."

47.     On March 14, 2017, Original Company, as incorporator caused the filing of articles of incorporation with the Colorado Secretary of State to form a new subsidiary corporation with

the name "Potnetwork Holding Inc." ("New PHI"), a defendant herein. New PHI bears Colorado Secretary of State Id number 20171202909.

48.    New PHI's authorized capital structure was identical to the capital structure the Original Company, to wit: 1,000,060,000 shares of stock, comprised of 1,000,000,000 shares of commons stock, 10,000 shares of undesignated preferred stock and 50,000 shares of Class A preferred shares.

49.    On March 14, 2017, New PHI, as incorporator, caused the filing of articles of incorporation with the Colorado Secretary of State to form a new corporation with the name "SND Auto Group Inc." ("New SND"), a defendant herein. New SND bears Colorado Secretary of State ID number 20171202933.

50.    New SND's authorized capital structure was identical to the capital structures of New PHI and Original Company.

51.    By a written merger agreement (the "Merger Agreement") dated effective March 17, 2017, Original Company and New SND agreed to a merger in accordance with Section 7-111-104 of the Colorado Business Corporation Act ("CBA"), pursuant to which New SND would be merged with and into Original Company, with New SND being the surviving corporation as a wholly owned subsidiary of New PHI.

52.    New SND and New PHI, entered into a written Plan of Reorganization (the "Plan of Reorganization") back dated to be effective March 17, 2017, pursuant to which the two companies agreed on a holding structure in accordance with Section 7-111-104 of the CBA to effectuate the merger transaction contemplated in the Merger Agreement.

53.    Pursuant to the terms of the Merger Agreement, upon the effective date of the merger, (March 17, 2017) ("Merger Effective Date"), each share of Original Company was

converted in the merger into the right to receive a duly issued, fully paid, and non-assessable share, or equal fraction of a share of New SND, having the same preferences, rights, and limitations as the share or fraction of a share of Original Company being converted in the merger.

54.    Pursuant to the terms of the Merger Agreement, and in direct violation of the anti-dilution provision contained in Notes 1 and 2, unexercised conversion rights granted to Original Company's convertible debt holders,  prior to the Effective Date would not be accorded a right to acquire shares of New SND and only Original Company's existing shareholders, as listed on Original Company's  stock transfer ledger, would be converted in the merger into the right to acquire shares of New SND  having the same preferences, rights, and limitations as the right to acquire shares of the Company being converted in the merger.

55.    Pursuant to the Plan of Reorganization, New SND and New PHI agreed to a share exchange, pursuant to which all of New SND's issued and outstanding shares (as of the Effective Date) would be sold to New PHI in exchange for a specified number of shares of New PHI.

56.    Pursuant to the Plan of Reorganization, existing shareholders of Original Company as of the date of the merger transaction would automatically receive, on a one for one basis, shares of New SND  common stock in place of their shares of Original Company common stock.

57.    Upon information and belief, Original Company, New PHI and New SND consummated the merger transaction contemplated by the Merger Agreement and the Plan of Reorganization; New SND has merged into Original Company; Original Company's outstanding common stock was converted to shares of New SND and Original Company's common stock has been cancelled and retired; New SND continues as the corporation surviving the merger; and New SND has exchanged shares with New PHI as contemplated in the Plan of Reorganization.

58.     Following completion of the merger transaction, defendant Securities Counselors, Inc. ("SCI"), on behalf of New PHI and New SND, advised Southridge by letter dated April 27, 2017 that Southridge's debt instrument was now a liability of New SND; SCI's  letter ignores and disregards the Second Conversion Notice. A true and accurate copy of said letter is annexed hereto as Exhibit "E."

59.     Upon information and belief, defendant Vacarro, who was a controlling person with respect to Original Company, was the driving force behind the Company's decision to proceed with the merger transaction, and Vacarro dictated and controlled that transaction and directed Blum to take actions necessary to effectuate the merger.

60.     Upon information and belief, the merger transaction was developed and orchestrated by Vacarro and Randall Goulding for the purpose of avoiding Original Company's contractual obligations, including its conversion obligations under Note 2 and the STA, and the merger transaction served no legitimate purpose.

61.     Upon information and belief, defendants Randall Goulding and Securities Counselors, Inc. ("SCI") advised Original Company and Vacarro and assisted Vacarrao in devising the merger transaction as a devise to shift liabilities, and stock conversion rights with respect to Original Company common stock, out of and away from Original Company to a new privately held company, to the ultimate benefit of Vacarro.

62.     Upon consummation of the merger transaction, neither Original Company, New SND nor New PHI recognized Southridge as a shareholder despite Southridge having duly and properly exercised its conversion option under Note 2 before the Merger Agreement and Plan of Reorganization became effective.

63.    Since the merger was consummated, New SND and New PHI have treated

Southridge as a creditor that holds an unexercised right to convert its debt to stock of the

privately held subsidiary (New SND) and not as a stockholder of New PHI.


64.    Upon information and belief, Original Company disregarded and refused to honor

Southridge's Second Conversion Notice at Vacarro's direction, and upon further information and

belief, Vacarro directed Randall Goulding and SCI to send, on behalf of New PHI, a letter to

Southridge dated April 27, 2017 advising Southridge that, as a result of the merger transaction,

Southridge no longer had rights with respect to New PHI  and would have to look instead to New

SND.

65.    Although the rights of other parties that held rights to obtain common stock interest

in Original Company as a publicly traded corporation were subverted by the merger transaction,

Vacarro, on information and belief, was able to retire SND's remaining portion of Note 2 in

exchange for the right to receive 577,523,089 shares of New PHI common stock; Vacarro thus

used his control of Original Company, New SND and New PHI to provided himself  and his

company, SND, with preferential treatment.

66.    New SND was created by Original Company at the direction of Vacarro, as an

instrumentality of Original Company to effectuate the merger transaction for the purpose of

avoiding Original Company's contractual obligations, including the conversion obligations

provided under Note 2.

67.    Given Original Company's express obligations under Note 2 concerning the

conversion rights therein, including the anti-dilution provisions contained therein, and Original

Company's express covenant to act at all times in good faith to carry out the provisions of Note

2, including the conversion rights provided therein, and to take such action as necessary or appropriate to protect those conversion rights, Original Company's creation of New SND as an instrumentality to avoid those conversion rights was in violation of the terms of Note 2 and the STA.

68.    As an instrumentality of Original Company created expressly for, and directly involved in, the merger transaction conceived and orchestrated by Vacarro and Randall Goulding for the purpose of avoiding Original Company's obligations under the conversion provisions of Note 2, New PHI, New NSD and Original Company should regarded, for the purpose of this action, as one and the same.

*Defendants Unwind The Merger Transaction*

69.   On February 7, 2018, after Southridge commenced this civil action and after Defendants removed this case from the Connecticut Superior Court to this Court, Randall Goulding caused Original Company to file a document with the Colorado Secretary of State titled "**Statement of Correction Revoking a Filed Document,**" (the "Corrective Statement"). Attached to the Corrective Statement, is a document titled **"Agreement to Unwind, Vitiate and Void Ab Initio, the Reorganization and Merger, in Order to Restore PotNetwork Holdings Inc. to its Status Prior to March 3, 2017, in Order to then Redomicile in Wyoming**" (hereinafter the "Unwinding Agreement").

70.   The parties to the Unwinding Agreement are New PHI, New SND, and Original Company, and the Unwinding Agreement was executed on behalf of each party by defendant Richard Goulding in his ostensible capacity as president of each party. Upon information and belief, Richard Goulding is a family relation of defendant Randall Goulding.

71.   The effect of the Unwinding Agreement is to unwind the Merger Transaction that had been effectuated by Original Company, New SND, New PHI in March 2017.

72.   On February 7, 2018, Randall Goulding caused New SND to file a copy of the Corrective Statement, along with the attached Unwinding Agreement with the Colorado Secretary of State.

73.   On February 13, 2018, Randall Goulding cause Original Company to file a document with the Colorado Secretary of State titled "Amended and Restated Articles of Incorporation" (the "Amended Articles").  Attached to the Amended Articles is a document titled "**Articles of Incorporation of PHI Transition Corporation, changing its name to 'POTNETWORK HOLDINGS INC.'**"   Pursuant to the Amended Articles, Original Company's name became, once again, "PotNetwork Holdings, Inc."

74.   Also on February 13, 2018, Randall Goulding caused New PHI to file with the Colorado Secretary of State a document titled "Amended and Restated Articles of Incorporation," executed by defendant Goulding on behalf of  New PHI, pursuant to which New PHI's name was changed from "PotNetwork Holding Inc." to "PNH Holding Inc."

75.   On March 5, 2018, Randall Goulding caused Original Company to file a document with the Colorado  Secretary of State titled "**Statement of Correction Correcting Information for Historical Purposes**" (the "March 5 Correction").  Attached to the March 5 Correction is a document titled "**Agreement to now Unwind and Reverse the Reorganization and Merger, in order to Restore PotNetwork Holdings Inc. akin to its Status Prior to March 17, but as a Colorado Corporation, Correcting the  February 7, 2018 Filing to the Extent That It Suggests a Retroactive Effect**"  (the "Revised Unwinding Agreement").

76.     The Revised Unwinding Agreement was executed by all of the parties thereto by Richard Goulding in his ostensible capacity as President of each company.

77.     By the Revised Unwinding Agreement, Defendants sought to (1) remove the previous indication of an intent for Original Company to redomicile in Wyoming and (2) remove the stated intention in the Unwinding Agreement  that the unwinding of the Merger Transaction was retroactive to the date of the Merger Transaction.

78.     Notwithstanding that the Merger Transaction has been unwound, Original Company has not tendered the Conversion Shares to Southridge.

## FIRST COUNT
### (Original Company-  Specific Performance)

1 - 78.     Paragraphs 1-78 of this complaint are hereby made Paragraphs 1- 78 of the First Count.

79.     Southridge fulfilled all obligations imposed on it under the terms of the STA, including payment of the full purchase price specified in the STA.

80.     Southridge, as with the First Conversion Notice, properly exercised its right to convert a portion of its debt acquired pursuant to the STA when it issued the Second Conversion Notice to Original Company on January 30, 2017, and Second Conversion Notice thus provided Southridge with the legal right to own and have issued the Conversion Shares.

81.     Original Company, acting, upon information and belief, at the direction of Blum and under control of Vacarro, wrongfully, without justification, and in breach of the terms of Note 2 and the STA, failed and refused to honor the Second Conversion Notice and issue the Conversion Shares to Southridge and thereby breached the STA and Note 2.

82.     In reasonable reliance on the STA and Note 2, Southridge has changed its position such that injustice can be avoided only by specific enforcement of the TSA, Note 2 and the Second Conversion Notice.

83.     Judgment compelling specific performance by Original Company of its obligations to recognize and honor the Second Conversion Notice and issue the shares to Southridge that Southridge would have had is necessary to place Southridge in the position that it would have been in but for New PHI's and New SND's unexcused failure to honor the Second Conversion Notice.

84.     Southridge seeks a judgment of specific performance compelling Original Company to issue, effective January 30, 2017, 2,972,600 shares of Original Company common stock (i.e. the Conversion Shares) to Southridge.

**SECOND COUNT**
**(Original Company, New PHI, New SND and Vacarro - Constructive Trust)**

1 - 84.   Paragraphs 1-84 of the First Count are hereby made Paragraphs 1- 84 of the Second Count.

85.     Original Company made a promise to Southridge to convert some or all of the debt acquired by Southridge pursuant to the STA and Note 2 into common stock of Original Company.

86.     In reliance on said promise and Original Company's consent to the STA, Southridge paid and transferred to SND the purchase price called for under the terms of the STA.

87.     As a result of its merger with Original Company, New SND assumed the liabilities and obligations imposed on Original Company flowing from Original Company's promises, including its promise to honor the conversion option in Note 2.

88.    Original Company, New PHI, New SND and Vacarro, through the merger

transaction, have attempted to circumvent Southridge's conversion rights and render Southridge

a mere creditor of New SND with no right to own stock in the new public entity that effectively

replaced Original Company,  New PHI.

89.    Southridge is entitled to a constructive trust over the shares of Original Company

that would otherwise have been issued to Southridge had Original Company, New SND, New

PHI  and Vacarro not attempted to  circumvent Southridge's conversion rights under the STA

and Note 2.

**THIRD COUNT**
**(Original Company -  Breach of Contract)**

1 - 89.    Paragraphs 1-89 of the Second Count are hereby made Paragraphs 1- 89 of the

Third Count.

90.    Original Company breached the STA and Note 2 when it failed to honor the Second

Conversion Notice and issue 2,972,600 shares of Original Company common stock to

Southridge.

91.    As a result of Original Company's breach of the STA and Note 2, Southridge has

suffered damages in an amount to be determined at trial but not less than $743,150.00.

**FOURTH COUNT**
**(Original Company, New SND and New PHI  -  Breach of Implied Covenant of Good Faith**
**and Fair Dealing)**

1 - 91.    Paragraphs 1- 91 of the Third Count are hereby made Paragraphs 1- 91 of the

Fourth Count.

92.    The conversion rights available to Southridge under the terms of Note 2 were a

material benefit of Note 2 and the STA to Southridge, and Southridge reasonably expected that it

would receive the Conversion Shares upon exercise of its conversion rights under Note 2.

93.    Original Company impeded Southridge's right to receive the Conversion Shares by refusing to honor the Second Conversion Notice.

94.    Original Company's failure to honor the Second Conversion Notice was not based on neglect or refusal prompted by any honest mistake as to Southridge's conversion rights.

95.    Original Company's refusal to honor the Second Conversion Notice was prompted by the Defendants' objective to deprive Southridge from owning stock interests in what would become the parent holding company, New PHI, and to shift Southridge's right to own stock in the public company to a privately traded and less valuable subsidiary, New SND.

96.    New SND, as the surviving corporation following its merger into and with Original Company, and New PHI, as the new public trading company that effectively replaced Original Company, are liable to Southridge for Original Company's breach of the implied covenant of good faith and fair dealing.

97.    Original Company, New SND and New PHI, in refusing to honor the Second Conversion Notice as alleged above, acted with reckless indifference to the rights of Southridge to convert its debt under Note 2 into stock in a publicly traded company, Original Company or New PHI.

98.    Original Company, New SND and New PHI, in refusing to honor the Second Conversion Notice as alleged above, intentionally and wantonly violated Southridge's right to convert its debt under Note 2 into stock in a publicly traded company, Original Company or New PHI.

99.    Southridge is entitled to damages in an amount to be determined at trial but not less than $743,150.00.

## FIFTH COUNT
## (Original Company and SND - Breach of Warranty)

1 - 99.   Paragraphs 1- 99 of the Fourth Count are hereby made Paragraphs 1- 99 of the Fifth Count.

100.   SND expressly represented and warranted in the STA that it was not an "Affiliate" of Original Company  for the purpose of Securities and Exchange Commission ("SEC") Rule 144 (17 C.F.R. § 230.144) of the Securities Act of 1933.

101.   SND's express warranty and representation in the STA that SND was not an affiliate of Original Company was material to Southridge's decision to enter into the STA, and Southridge relied on said warranty and representation in entering into the STA.

102.   The accuracy and correctness of SND's express warranty and representation in the STA that SND was not an affiliate of Original Company was a condition to Southridge's obligation under the STA to consummate the STA and pay SND the purchase price specified in the STA.

103.   By its execution of the STA, Original Company implicitly affirmed and assumed the express warranties of SND

104.   SND and Original Company materially breached their warranties in that, upon information and believe, at all relevant times, was a control person with respect to both SND, SAMI and Original Company in that he possessed the power to direct the management and policies of  all of those companies.

105.   As a direct consequence of SND's and Original Company's foresaid breach of warranties, Southridge has sustained damages, including, but not limited, damages flowing from the adverse affect on its ability to tack onto SND's holding period under Rule 144.

## SIXTH COUNT
### (Original Company and SND - Fraud/Misrepresentation)

1 - 105.   Paragraphs 1- 105 of the Fifth Count are hereby made Paragraphs 1- 105 of the

Sixth Count.

106.    SND and Original company represented in the STA, as a matter of fact, that SND

was not an "Affiliate" of Original Company  for the purpose of Securities and Exchange

Commission ("SEC") Rule 144 (17 C.F.R. § 230.144) of the Securities Act of 1933.

107.    SND's and Original Company's statement that SND was not an "Affiliate" of

Original Company for the purpose of SEC Rule 144 was untrue and known by SND and Original

Company at the time of said representation to be false in that, upon information and belief,

Vacarro, at all relevant times, was a control person with respect to both SND, SAMI and Original

Company in that he possessed the power to direct the management and policies of all of those

companies.

108.    SND and Original Company represented to Southridge that SND was not an

"Affiliate" of Original Company in order to induce Southridge to enter into STA.

In entering into the STA and agreeing to pay the purchase price called for in the STA, Southridge

was acting on SND's and Original Company's false representation that SND was not an

"Affiliate" of Original Company for the purpose of SEC Rule 144, to its detriment and injury.

As a consequence of SND's and Original Company's fraud and misrepresentations, set forth

above, Southridge has sustained damages, in an amount to be determined at trial.

## SEVENTH COUNT
### (Charles Vacarro  - Tortious Interference with Contract Rights)

1 - 107.   Paragraphs 1-107 of the Sixth Count are hereby made Paragraphs 1- 107 of the

Seventh Count.

109.    At all relevant times, defendant Vacarro, upon information and belief, either directly or indirectly, owned a significant if not controlling interests in Original Company, SAMI and  SND, and possessed and exercised the power to direct or cause the direction of the management and policies of  those companies.

110.    Vacarro, by virtue of his connection to Original Company, SAMI and SND, was, at all relevant times, fully aware that Southridge  had entered into the STA and thereby acquired an interest in Note 2 including the associated conversion rights set forth in Note 2.

111.    Upon information and belief, with intent to interfere with Southridge's conversion rights under the STA and Note 2, Vacarro, working in conjunction with defendant Gary Blum, used his control over Original Company to cause Original Company to disregard the Second Conversion Notice and not issue the Conversion Shares to Southridge.

112.    Vacarro's, interference with Southridge's conversion rights was tortious insofar as Vacarro sought to prevent Southridge from acquiring any equity interest in parent company, Original Company, and the resulting dilution of his own interests in that company.

113.    Vacarro caused Original Company to disregard the Second Conversion Notice notwithstanding that there was no lawful basis for Original Company to have done so.

114.    In tortiously interfering with Southridge's contractual rights, as alleged above, Vacarro acted with reckless indifference to the rights of Southridge to convert its debt under Note 2  into stock in a publicly traded company, Original Company or New PHI.

115.    In tortiously interfering with Southridge's contractual rights, as alleged above, Vacarro intentionally and wantonly violated Southridge's right to convert its debt under Note 2 into stock in a publicly traded company, Original Company or New PHI.

116.     As a direct and proximate cause of Vacarro's tortious interference with Southridge's conversion rights under the STA and Note 2, Southridge has suffered damages in an amount to be determined at trial, but not less than $743,150.00.

### EIGHTH COUNT
### (Gary Blum - Tortious Interference with Contract Rights)

1 - 115.   Paragraphs 1-115 of the Seventh Count are hereby made Paragraphs 1- 115 of the Eighth Count.

117.     At all relevant times, defendant Gary Blum ("Blum") served as President (and sole director) of Original Company, president of New SND and president of New PHI.

118.     Blum executed the STA on behalf of Original Company and was fully aware that Southridge had entered into the STA and thereby acquired an interest in Note 2 including the associated conversion rights set forth in Note 2.

119.     Upon information and belief, with intent to interfere with Southridge's conversion rights under the STA and Note 2, Blum, working in conjunction with or at the direction of Vacarro, used his position and office with Original Company to cause Original Company to disregard the Second Conversion Notice and not issue the Conversion Shares to Southridge.

120.     Blum's interference with Southridge's conversion rights was tortious insofar as Blum sought to prevent Southridge from acquiring any equity interest in parent company, Original Company, and the resulting dilution of equity interests (direct or indirect) of certain other parties, including Vacarro.

121.     Blum caused Original Company to disregard the Second Conversion Notice notwithstanding that there was no lawful basis for Original Company to have done so.

122.   In tortiously interfering with Southridge's contractual rights, as alleged above, Blum acted with reckless indifference to the rights of Southridge to convert its debt under Note 2  into stock in a publicly traded company, Original Company or New PHI.

123.   In tortiously interfering with Southridge's contractual rights, as alleged above, Blum intentionally and wantonly violated Southridge's right to convert its debt under Note 2 into stock in a publicly traded company, Original Company or New PHI.

124.   As a direct and proximate cause of Blum's tortious interference with Southridge's conversion rights under the STA and Note 2, Southridge has suffered damages in an amount to be determined at trial, but no less than $743,150.00.

**NINTH COUNT**
**(Randall Goulding, Richard Goulding and Securities Counselors, Inc. -**
**Tortious Interference and Aiding And Abetting**
**Tortious Interference with Contract Rights)**

1 - 123.   Paragraphs 1-123 of the Eighth Count are hereby made Paragraphs 1-123 of the Ninth Count.

125.   As alleged above, defendants Vacarro and Blum tortiously interfered with Southridge's contract rights under the STA which caused Southridge to suffer injury.

126.   Defendants Randall Goulding, Richard Goulding and SCI, upon information and belief, aided and abetted in defendants Vacarro's and Blum's tortious interference activities when they devised for Vaccarro and Blum the merger transaction scheme as a mechanism for Original Company to shed financial liability to the prejudice of its existing debt holders.

127.   Defendants Randall Goulding, Richard Goulding and SCI, upon information and belief, further aided and abetted defendants' Vacarro's and Blum's tortious conduct when, in response to repeated requests by Southridge to New PHI to honor the Second Conversion Notice

and provide Southridge with the Conversion Shares, SCI sent its letter to Southridge in an attempt to persuade Southridge that it had no right to shares of the public company, New PHI, but instead had only rights to shares of the new privately held subsidiary, New SND.

128.    Upon information and belief, in sending the April 27, 2017 letter to Southridge, SCI and Randall Goulding were fully aware of their role in Vacarro's and Blum's tortious scheme to deprive Southridge of its rights to hold common stock in New PHI.

129.    In sending the April 27, 2017 letter to Southridge, SCI and Randall Goulding tortiously interfered with Southridge's contract rights under the STA or knowingly and substantially assisted defendant's Vacarro and Blum in their tortious interference with Southridge's contract rights under the STA, including its right to receive the Conversion Shares.

130.    In tortiously Interfering with, or aiding and abetting the tortious interference with Southridge's contractual rights, as alleged above, Randall Goulding, Richard Goulding and  SCI acted with reckless indifference to the rights of Southridge to convert its debt under Note 2 into stock in a publicly traded company, Original Company or New PHI.

131.     In tortiously interfering with, or aiding and abetting the tortious interference with Southridge's contractual rights, as alleged above, Randall Goulding, Richard Goulding and SCI intentionally and wantonly violated Southridge's right to convert its debt under Note 2 into stock in a publicly traded company, Original Company or New PHI.

132.    Southridge has sustained damages as a result of Randall Goulding's, Richard Goulding's and SCI's conduct in an amount to be determined at trial but not less than $743,150.00.

**WHEREFORE**, the Plaintiff demands judgment on its amended Complaint as follows:

<u>**AS TO THE FIRST COUNT:**</u>
1. A mandatory injunction ordering specific performance;
2. Reasonable attorneys' fees;
3. Costs of this action; and
4. Such other and further relief as the Court deems appropriate.

<u>**AS TO THE SECOND COUNT**</u>:
1. A Construct Trust;
2. Reasonable attorneys' fees;
2. Costs of this action; and
3. Such other and further relief as the Court deems appropriate.

<u>**AS TO THE THIRD COUNT:**</u>
1. Damages;
2. Interest;
3. Reasonable attorney's fees;
3. Costs of this action; and
4. Such other and further relief as the Court deems appropriate.

<u>**AS TO THE FOURTH COUNT**</u>:
1. Damages;
2. Punitive Damages;
3. Reasonable attorney's fees'
4. Interest;
5. Costs of this action; and
6. Such other and further relief as the Court deems appropriate.

<u>**AS TO THE FIFTH COUNT**</u>:
1. Damages;
2. Punitive Damages;
3. Interest;
4. Costs of this action; and
5. Such other and further relief as the Court deems appropriate.

<u>**AS TO THE SIXTH COUNT**</u>:
1. Damages;
2. Interest;
3. Costs of this action; and
4. Such other and further relief as the Court deems appropriate.

**AS TO THE SEVENTH COUNT:**
1.        Damages;
2.        Punitive Damages;
3.        Interest;
4.        Costs of this action; and
5.        Such other and further relief as the Court deems appropriate.

**AS TO THE  EIGHTH COUNT**:
1.        Damages;
2.        Punitive Damages;
3.        Interest;
4.        Costs of this action; and
5.        Such other and further relief as the Court deems appropriate.

**AS TO THE NINTH COUNT:**
1.        Damages;
2.        Punitive Damages;
3.        Interest;
4.        Costs of this action; and
5.        Such other and further relief as the Court deems appropriate.

THE PLAINTIFFS
By their attorneys
FLEISCHER LAW LLC

By:    /s/ Robert M. Fleischer
Robert M. Fleischer
12 Centennial Drive
Milford, CT 06461
Tel: (203) 283-3369
Email: robf@ctnylaw.com

**CERTIFICATION OF SERVICE**

The undersigned hereby certifies that on this 6th day of April, 2018, a copy of the foregoing Amended Complaint was filed electronically via the Court's CM/ECF System and served by mail on anyone unable accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

    /s/ Robert M. Fleischer
Robert M. Fleischer
Fleischer Law LLC
12 Centennial Drive
Milford, CT 06461
(203) 283-3369
Email: robf@ctnylaw.com